**24-1235; 24-1309**

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

**v.**

REVEN HOLDINGS, INC., D/B/A REVEN PHARMACEUTICALS;
REVEN PHARMACEUTICALS, INC.; BRIAN D. DENOMME;
PETER B. LANGE; MICHAEL A. VOLK,

Defendants-Appellants,

**and**

REVEN, LLC; REVEN IP HOLDCO, LLC; REVEN ONCOLOGY
LICENSING, LLC; HEALTH ANALYTICS AND RESEARCH
SERVICES, LLC,

Relief Defendants-Appellants.

---

On Interlocutory Review of Orders of the United States District Court
for the District of Colorado, 1:22-cv-03181-DDD-SBP (Domenico, J.)

---

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

---

DANIEL STAROSELSKY
Assistant General Counsel

PAUL G. ÁLVAREZ
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov

**Oral argument is not requested.**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF PRIOR OR RELATED APPEALS ................................... x

INTRODUCTION ................................................................................ 1

COUNTERSTATEMENT OF JURISDICTION ......................................... 4

ISSUES PRESENTED ......................................................................... 5

COUNTERSTATEMENT OF THE CASE ............................................... 6

    A.    Facts ................................................................................ 6

        1.    The Reven Companies and the Reven Principals .............. 6

        2.    The defendants made multiple false and materially
            misleading statements to investors. ..................................... 7

            a.    The defendants understated by millions the
                 Reven Principals' compensation. ............................... 8

            b.    The defendants falsely represented that Reven
                 had audited financial statements and otherwise
                 misrepresented Reven's readiness to become
                 publicly traded. ........................................................ 8

            c.    The defendants represented that Reven was not
                 subject to litigation even though it was being
                 sued for securities fraud. .......................................... 10

    B.    Procedural Background ................................................... 12

        1.    The Commission filed a complaint, and the district
            court granted the Commission's motion for a TRO and
            an asset freeze. ................................................................ 12

# TABLE OF CONTENTS (continued)                                    Page

2.    The district court granted the parties' joint motion and stipulation to vacate the preliminary injunction hearing and to indefinitely extend the TRO. ...................................13

3.    The district court entered a preliminary injunction and asset freeze. ...........................................................14

     a.    The district court found that the Commission clearly established a likelihood of success on its fraud claims. ................................................15

     b.    The district court found a freeze was appropriate but permitted the defendants to seek modifications to it. ..............................17

4.    The district court declined to completely lift the freeze, but it modified the freeze......................................19

     a.    The May 17, 2024, order.............................19

     b.    The July 26, 2024, order..............................20

STANDARD OF REVIEW ........................................................25

SUMMARY OF ARGUMENT ....................................................25

ARGUMENT ..........................................................................27

I.    The district court acted within its discretion in ordering a preliminary, asset-freezing injunction pending resolution of the action. ......................................................................28

   A.    Relevant Legal Standards...............................................29

     1.    Preliminary Injunction and Asset Freeze ..........................29

     2.    Antifraud Violations...............................................32

   B.    The court reasonably found that the Commission established a likelihood of success on the merits of its fraud claims. ..........34

TABLE OF CONTENTS (continued)                    Page

   1. The defendants made misstatements about the Reven Principals' compensation. ........................................................34

    a. The defendants misstated the Reven Principals' compensation. ...............................................34

    b. The defendants' compensation-related misstatements and omissions were material. ..........37

    c. The defendants made their compensation-related misrepresentations with scienter and, at a minimum, negligently...................................................40

   2. The district court reasonably found that the defendants misled investors about Reven's readiness to go public ...........................................................................42

    a. The defendants' statements were false and misleading.....................................................43

    b. The defendants' statements were material. .............46

   3. The district court reasonably found that the defendants lied about being sued for securities fraud.........................48

  C. The court acted within its discretion in evaluating the remaining preliminary injunction factors.....................................50

   1. Irreparable Harm ...................................................................50

   2. Balance of Hardships and the Public Interest....................51

   3. The district court was not required to find a likelihood of future violations, but in any event, that finding is amply supported in the record. ...........................................56

II. The district court acted within its discretion in partially lifting the asset freeze under the more specific conditions proposed by the defendants................................................................................................58

# TABLE OF CONTENTS (continued)         Page

A.     The district court acted within its discretion in declining to dissolve the freeze. ........................................................................59

B.     The district court acted within its discretion in modifying the freeze. ............................................................................61

III.    The court acted within its discretion in issuing the preliminary injunction without a hearing. ....................................................63

CONCLUSION ..................................................................................67

CERTIFICATE OF COMPLIANCE ......................................................................

CERTIFICATE OF DIGITAL SUBMISSION ......................................................

CERTIFICATE OF SERVICE .............................................................................

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) ..............................35

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994) ...........................................................................52

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ..................................................................... 64, 66

*CFTC v. Am. Metals Exchange Corp.*, 991 F.2d 71 (3d Cir. 1993) .....................30

*Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940) ...................................... 29, 31

*Flood v. ClearOne Communications, Inc.*, 618 F.3d 1110 (10th Cir. 2010) .... 5, 25

*Free the Nipple-Fort Collins v. Fort Collins*, 916 F.3d 792 (10th Cir. 2019)........32

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) .................................45

*Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003) ...................................................36

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) ...................... 36, 38, 39

*Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999).........................................................................................31

*Hampton v. root9B Tech., Inc.*, 897 F.3d 1291 (10th Cir. 2018)..........................16

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ...................45

*Lorenzo v. SEC*, 587 U.S. 71 (2018) ....................................................................52

*Lundgrin v. Claytor*, 619 F.2d 61 (10th Cir. 1980) ..............................................30

*McCurdy v. SEC*, 396 F.3d 1258 (D.C. Cir. 2005) ..............................................42

## TABLE OF AUTHORITIES (CONTINUED)

*New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo*,
　122 F.4th 28 (2d Cir. 2023), as amended (Oct. 31, 2024) ..........................43

*Oklahoma v. United States Dep't of Health & Hum. Servs.*,
　107 F.4th 1209 (10th Cir. 2024).......................................................................27

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
　575 U.S. 175 (2015).........................................................................................37

*Pittman v. Long*, 2024 WL 128169 (D. Colo. Jan. 11, 2024) ...............................64

*Prosper, Inc. v. Innovative Software Technologies*,
　188 F. App'x 703 (10th Cir. 2006) ..................................................................65

*Resol. Tr. Corp. v. Cruce*, 972 F.2d 1195 (10th Cir. 1992) ........................... 27, 29

*Reynolds and Reynolds Co. v. Eaves*,
　149 F.3d 1191 (10th Cir. June 10, 1998) (table decision)............................63

*Robinson v. City of Edmond*, 160 F.3d 1275 (10th Cir. 1998) ....................... 25, 65

*SEC v. Cell>Point, LLC*, 2022 WL 444397 (D. Col. Feb. 14, 2022) ...................57

*SEC v. Chappell*, 107 F.4th 114 (3d Cir. 2024) ........................... 30, 51, 52, 53, 57

*SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 3d 1441 (D.D.C. 1992) .............60

*SEC v. Curshen*, 372 F. App'x 872 (10th Cir. 2010) ...........................................56

*SEC v. G. Weeks Sec., Inc.*, 678 F.2d 649 (6th Cir. 1982)....................................66

*SEC v. GenAudio*, 32 F.4th 902 (10th Cir. 2022)................................ 39, 40, 46, 47

*SEC v. Hallam*, 42 F.4th 316 (5th Cir. 2022) .....................................................63

*SEC v. Kokesh*, 884 F.3d 979 (10th Cir. 2018) ...................................................35

*SEC v. Lemelson*, 57 F.4th 17 (1st Cir. 2023).......................................................36

# TABLE OF AUTHORITIES (CONTINUED)

*SEC v. Liu*, 851 F. App'x 665 (9th Cir. 2021) ........................................................51

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972) .......................37

*SEC v. Navellier*, 108 F.4th 19 (1st Cir. 2024) ....................................................47

*SEC v. Pros Int'l, Inc.*, 994 F.2d 767 (10th Cir. 1993) ................................. 31, 56

*SEC v. Rsch. Automation Corp.*, 585 F.2d 31 (2d Cir. 1978) .............................38

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ..................................................32

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012)........................................................33

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ..................................................47

*SEC v. World Tree Fin., LLC*, 43 F.4th 448 (5th Cir. 2022) ................................47

*SEC v. Young*, 121 F.4th 70 (10th Cir. 2024) ..........................................................6

*SEC v. Young*, 2022 WL 2977080 (10th Cir. 2022)....................................... 25, 65

*SEC v. Zandford*, 535 U.S. 813 (2002) ..................................................................37

*Shaw v. AAA Engineering & Drafting, Inc.*,
     213 F.3d 538 (10th Cir. 2000).........................................................................65

*Slack Tech., LLC v. Pirani*, 598 U.S. 759 (2023) ...................................................8

*Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024) ................................ 24, 30, 31

*Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.*,
     404 U.S. 6 (1971)..............................................................................................37

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,
     805 F.2d 351 (10th Cir. 1986).........................................................................30

*United States v. Arthur Young & Co.*, 465 U.S. 805 (1984) ................................42

TABLE OF AUTHORITIES (CONTINUED)

*United States v. Naftalin*, 441 U.S. 768 (1979) ........................................37

*United States v. O'Hagan*, 521 U.S. 642 (1997) ......................................37

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ..............36

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ...............30

*Wyandotte Nation v. Sebelius*, 443 F.3d 1247 (10th Cir. 2017) ..........................25

STATUTES, RULES, AND OTHER AUTHORITIES

Securities Act of 1933, 15 U.S.C. 77a, *et seq.*

Section 7(a)(2)(A), 15 U.S.C. 77g(a)(2)(A) ................................................10

Section 17(a), 15 U.S.C. 77q(a) ................................................... 7, 33

Section 20(b), 15 U.S.C. 77t(b) ................................................. 4, 29

Section 22(a), 15 U.S.C. 77v(a) ....................................................4

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

Section 2, 15 U.S.C. 78b ............................................... 37, 52

Section 10(b), 15 U.S.C. 78j(b) ............................................ 7, 32

Section 21(d), 15 U.S.C. 78u(d) ...................................................4

Section 21(d)(1), 15 U.S.C. 78u(d)(1) .......................................29

Section 21(d)(5), 15 U.S.C. 78u(d)(5) .......................................29

Section 21(e), 15 U.S.C. 78u(e) ...................................................4

Section 27(a), 15 U.S.C. 78aa(a) ...............................................4

Rules under the Securities Exchange Act of 1934, 17 C.F.R. 240.01, *et seq.*

Rule 10b-5, 17 C.F.R. 240.10b-5 ...............................................32

## TABLE OF AUTHORITIES (CONTINUED)

28 U.S.C. 1292(a)(1) ............................................................................5

Fed. R. Civ. P. 78(b) .........................................................................63

D.C.COLO.LCivR 7.1(h)..................................................................63

MISAPPROPRIATION, Black's Law Dictionary (12th ed. 2024)..........................36

11 Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2904 (3d ed.)..........20

11A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2949 (3d ed.).......65

"Should My Company Go Public?", *available at*:
    https://www.sec.gov/resources-small-businesses/going-
    public/should-my-company-go-public ....................................................42

## STATEMENT OF PRIOR OR RELATED APPEALS

None.

## INTRODUCTION

This is a civil law enforcement action that the Securities and Exchange Commission brought against Reven Holdings, Inc., a biotechnology and pharmaceutical company, as well as related entities and the individuals who controlled Reven and those entities. The defendants raised more than $44 million from approximately 175 investors through the sale of Reven securities between 2019-2021. 10-APPX-1452.[1] The Commission alleged that the defendants violated antifraud provisions of the securities laws by: (1) understating by millions of dollars the amount of investor funds that the defendants used for executive compensation—indeed, it is undisputed that the individual defendants "took in $4.89 to $5.75 million more than they disclosed to investors" (1-ORDER-9); (2) falsely stating that Reven had audited financials (when in reality Reven had not even started an audit) and otherwise misrepresenting Reven's readiness to become a publicly traded company; and (3) making false and

---

[1]    "__-APPX-__" refers to the appendices filed with the appellants' brief. "Br.__" refers to the opening brief. "SA-__" refers to the supplemental appendix filed with the Commission's brief. "1-ORDER-__" refers to the district court's March 29, 2024, order on review, and "2-ORDER-__" refers to the July 26, 2024, order on review, both of which are attached to appellants' brief.

misleading statements regarding a separate lawsuit alleging that some of the defendants had committed securities fraud.

On the Commission's application, the district court entered a temporary restraining order to halt the defendants' fraud and preserve Reven's few remaining assets. 10-APPX-1450—75. The court found that the Commission had "made a clear showing that it would likely succeed in proving that the defendants have violated federal securities laws and will likely do so again if they are not restrained." 10-APPX-1450—51. Finding that the "defendants' dissipation or concealment of assets could cause immediate and irreparable loss to investors," the court further determined that a temporary freeze of the defendants' assets was appropriate to preserve the court's authority to enter appropriate relief should liability be established. 10-APPX-1461—62. By that point, with millions of investor funds in the defendants' pockets and Reven's flagship product still at the Phase 2 clinical testing stage, the company was in concededly "dire financial straits." 2-ORDER-18, n.10; Br.13.

The parties agreed to continue the terms of the TRO pending the district court's consideration of the Commission's motion for a preliminary injunction, and the court then issued two orders that are on review in these

2

consolidated appeals.  First, the court converted the TRO into a preliminary, asset freezing injunction.  1-ORDER-1—30.  Second, the court denied the defendants' motion to lift the freeze in its entirety and it instead modified the freeze—in ways that the defendants suggested—to allow the defendants to "explore alternative methods of obtaining the financing necessary to preserve Reven's assets and keep the company afloat," subject to the court's supervision.  2-ORDER-16—18.

The defendants cannot show any abuse of discretion in the district court's thoughtful oversight of this ongoing, evolving litigation.  The defendants principally argue that a freeze should not have issued because they did not violate the law.  But they cannot identify any clear error in the court's weighing of the evidence—which, at this preliminary stage of the case, amply shows that the defendants likely committed securities fraud.  And the court reasonably weighed the other equitable considerations in issuing the injunction.

The defendants also challenge the court's decision to modify, rather than dissolve the freeze.  But the court reasonably concluded that, given the defendants' fraud, it could not restore to them unfettered access to Reven's assets.  2-ORDER-17.  Finally, the court reasonably issued the

3

freeze based on documentary evidence, rather than a live evidentiary hearing, because: (1) the federal rules permit courts to determine motions on the briefs; and (2) the parties jointly moved to vacate the hearing that the court had set, and the defendants thereafter never asked the court to hold a live hearing.

This Court should affirm the interlocutory orders on review.

COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction under Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77t(b), 77v(a), and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78u(d), 78u(e), and 78aa(a).

On March 29, 2024, the district court entered a preliminary injunction to restrain the defendants from further securities law violations and to prevent them from dissipating assets. ORDER-1—30. The defendants filed a timely notice of appeal of that order. This Court then placed that interlocutory appeal (24-1235) in abeyance because the defendants had, in the interim, filed a motion to dissolve or, alternatively, to modify the asset freeze, which remained pending in the district court. On July 26, 2024, the court issued an order declining to dissolve the freeze but modifying it in

4

part.  *See* 2-ORDER-1—22.  The defendants timely appealed that July order (24-1309), and this Court consolidated the appeals.

This Court has jurisdiction under 28 U.S.C. 1292(a)(1).  *See Flood v. ClearOne Communications, Inc.*, 618 F.3d 1110, 1114-15 (10th Cir. 2010) (reviewing consolidated appeals of a preliminary injunction order and an order declining to modify or dissolve the injunction).

## ISSUES PRESENTED

1.    Whether the district court acted within its discretion in issuing a preliminary, asset-freezing injunction.

2.    Whether the district court acted within its discretion in modifying, rather than lifting, the freeze.

3.    Whether the district court acted within its discretion in issuing the preliminary, asset-freezing injunction on the basis of documentary evidence.

COUNTERSTATEMENT OF THE CASE

**A.     Facts**

**1.     The Reven Companies and the Reven Principals**

Defendant Reven Holdings, Inc. ("Reven"), a successor to defendant Reven Pharmaceuticals, Inc., is a privately held biotechnology and pharmaceutical company formed in 2018.  1-ORDER-2.  According to the defendants, Reven's primary focus has been developing a cardiovascular and anti-inflammatory intravenous drug called Rejuveinix ("RJX").  *Id.* Defendants Brian Denomme, Peter Lange, and Michael Volk (the "Reven Principals") are co-founders, members of the board, and executive officers of Reven, and they collectively control the majority of Reven's stock.   1-ORDER-2—3.

The Commission's complaint also named several relief defendants—non-violators who are joined in a securities enforcement action to aid the recovery of assets.  *See SEC v. Young*, 121 F.4th 70, 73 n.1 (10th Cir. 2024). These entities—Reven, LLC; Reven IP Holdco, LLC; Reven Oncology Licensing, LLC; and Health Analytics & Research Services—are either subsidiaries of Reven Holdings or companies owned by the Reven Principals.  1-ORDER-3; 2-ORDER-2.  The relief defendants hold Reven

6

intellectual property and other assets. *Id*. The relief defendants are

captioned as appellants in this Court, but they have not made any

independent argument about their relief defendant status.

> ### 2. The defendants made multiple false and materially misleading statements to investors.

After examining the allegations in the Commission's complaint, the

arguments in the parties' briefs, and the record evidence, the district court

found that the evidence "clearly shows that the Commission is likely to

prove" that the defendants violated antifraud provisions of the federal

securities laws. 1-ORDER-7; *see* Securities Act Section 17(a), 15 U.S.C.

77q(a); Exchange Act Section 10(b), 15 U.S.C. 78j(b). For years, the

defendants made material misrepresentations to investors about three

subjects: (1) the Reven Principals' compensation; (2) the existence of

audited financial statements and Reven's readiness to go public; and

(3) Reven's history of being sued for securities fraud. The violations were

"serious, resulting in millions of dollars of misappropriated investor

funds." 1-ORDER-27. And there was "substantial evidence that the

various misstatements were made knowingly and with intent to hide

material facts from investors to induce them to invest." *Id.*

### a.    The defendants understated by millions the Reven Principals' compensation.

It is undisputed that, between 2019 and 2021, the defendants solicited investors while understating by millions of dollars the amount of investor funds that the defendants used as compensation for the Reven Principals. 1-ORDER-8—14.  Reven's private placement memoranda ("PPMs") disclosed the Reven Principals' collective annual compensation between 2019 and 2021 to be, at most, between $5.58 million and $6.44 million.  1-ORDER-8.  But it is undisputed that, at a minimum, the "Reven Principals took in $4.89 to $5.75 million more than they disclosed to investors."  1-ORDER-9.

### b.    The defendants falsely represented that Reven had audited financial statements and otherwise misrepresented Reven's readiness to become publicly traded.

The defendants knew that to be eligible to be a publicly traded company, Reven was required "to file tax returns, obtain audited financial statements, [file] an S-1 registration statement with the SEC, obtain a third-party valuation, and meet certain market targets…."  1-ORDER-18—19; *see generally Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762-63 (2023).  It is undisputed that Reven "never completed or filed its 2018-2020 tax returns

and that no firm was ever retained to audit Reven's financial statements."
1-ORDER-19.  Reven also had not completed the "'considerable
undertaking'" of reconciling its bookkeeping records—a prerequisite to
filing tax returns and obtaining audited financial statements.  *Id.* (quoting
12-APPX-1709); *see also* 15-APPX-2729—30 (Reven's then-CFO "repeatedly
told the Reven Principals … that Reven's financial statements could not be
audited, and that Reven could not go public until the financial records
were reconciled.").  And the Commission introduced unrebutted evidence
that "Reven did not meet all the requirements for listing by either [stock
exchange] that Reven represented to investors it would list on."  1-APPX-
123; *see* 1-ORDER-19; 12-APPX-1677—1727.

Nevertheless, in November and December 2021, Reven represented
to investors that the "Company *has* the minimum required two years of
audited financial statements ending August 2021"—a statement that was
"plainly untrue."  1-ORDER-19—20 (emphasis added).  Previous versions
of the documents stated that Reven "will have" audited financials, but
Reven changed that phrasing to state that it "has" audited financials.  1-
ORDER-20.  The defendants also stated that Reven was "*currently
undergoing* [its] first audit now," when in reality the "Reven Principals

9

knew there was no pending audit at that time." 1-ORDER-15—17, 21—22 (emphasis added). The defendants further falsely asserted that Reven "has completed all the necessary groundwork to accomplish a listing and public offering of its shares with the exception of the completion of its financial audit." 1-ORDER-17.

In addition to stating that Reven had undergone, or was currently undergoing, an audit, Reven stated that an audit "should be finished in the next 45-60 days." 1-ORDER-17. But, as discussed, the defendants had not even started an audit. Similarly, the defendants stated that Reven would file an S-1 registration statement "within the next 3-5 weeks." 1-ORDER-17. But Reven was nowhere close to having two years of audited financials, as is required for the filing of an S-1 registration statement. *See* 15 U.S.C. 77g(a)(2)(A).

> **c.    The defendants represented that Reven was not subject to litigation even though it was being sued for securities fraud.**

In 2016, a guardian suing on behalf of an 84-year-old investor with diminished capacity brought on by Alzheimer's Disease filed a lawsuit in Florida state court, alleging that Reven Pharmaceuticals and Lange committed securities fraud by inducing the investor to invest most of his

liquid net worth—over $2.8 million—in Reven Pharmaceuticals.  13-APPX-1989, 2000, 2017.  In 2019, the plaintiff amended his complaint to name Reven, Reven LLC, and Volk as defendants.  13-APPX-2106—07.  This lawsuit was pending from August 2016 until September 2021, when the defendants used investor funds to settle the case for $2.75 million.  1-ORDER-22.

Despite being a defendant in that litigation, in February 2020, Lange emailed an investor, "we have no lawsuits from shareholders," and Lange as well as Volk then solicited that investor for additional investments throughout 2020.  1-ORDER-23.  In April 2020, Volk (after he and Reven were named as defendants) emailed a group of prospective investors a 2018 PPM that, according to Volk, was "an appropriate disclosure for compliance."  1-ORDER-23.  The 2018 PPM stated that "The Company [Reven Holdings, Inc.] is not currently the subject of any litigation."  *Id.*  In addition to categorically denying the existence of any lawsuit, Volk twice represented to investors that "we are not aware of any potential dispute or pending litigation and are not currently involved in a litigation proceeding … the outcome of which in management's opinion would be material to our financial condition or results of operations."  1-ORDER-23.

11

**B.      Procedural Background**

**1.      The Commission filed a complaint, and the district court granted the Commission's motion for a TRO and an asset freeze.**

In December 2022, the Commission filed this civil enforcement action seeking an emergency injunction and asset freeze to preserve the status quo, remedy Reven's fraud, and secure relief for the benefit of Reven's investors and the public interest. *See generally* 1-APPX-19—52.

On January 3, 2023, the district court issued a TRO and asset freeze preventing the defendants from further dissipating, encumbering, or selling what little remained of Reven's assets, while permitting the defendants an "allowance for necessary and reasonable living expenses" upon a showing to the court of good cause.  10-APPX-1465.  The court found that "[t]he Commission has made a clear showing that it will likely be successful in proving that the defendants have violated federal securities laws and will likely do so again if they are not restrained."  10-APPX-1451.  The court also found that the defendants' "dissipation or concealment of assets could cause immediate and irreparable loss to investors should the defendants thereby evade payment of any disgorgement that may become due."  10-APPX-1462.

12

As part of the same order, the court deemed the Commission's TRO motion a preliminary injunction motion, directed the defendants to show cause why it should not enter a preliminary injunction extending the TRO and asset freeze until final judgment, and set the case for a preliminary injunction hearing on January 13, 2023.  10-APPX-1473—1474.

> **2.    The district court granted the parties' joint motion and stipulation to vacate the preliminary injunction hearing and to indefinitely extend the TRO.**

Two days before the scheduled hearing date, the "parties jointly move[d]" the district court "to vacate the injunction hearing."  SA-29. "Counsel for Defendants and Relief Defendants" explained that they had "just been retained and need[ed] additional time to learn the facts of the case."  *Id.*  The Commission responded that it had "no objection to vacating the preliminary injunction hearing."  *Id.*  The parties also jointly sought to "extend all relief granted by the TRO … through the date and time of the Court's ruling on the Commission's motion for preliminary injunction or by further order of the court."  *Id.*  The motion was "without prejudice to any further requests by the Commission, the Defendants, and the Relief Defendants to reset such hearing on a future date."  *Id.*

The district court granted the joint motion the same day, vacating the hearing and extending the deadline to respond to the Commission's preliminary injunction motion.  15-APPX-2734.  In the year that followed, the defendants received four unopposed extensions to respond to the Commission's preliminary injunction motion, before they ultimately filed their opposition in June 2023.  *See* 1-APPX-10—12 (Dkts. [51], [66], [71], [81]); 12-APPX-1677—1727.  The defendants also obtained multiple unopposed modifications to the freeze to permit them to, *inter alia*, preserve and maintain Reven's intellectual property and patents during that time.  2-ORDER-12; 1-APPX-10—15 (Dkts. [55], [65], [68], [72], [74], [117]).  After successfully moving to vacate the hearing, the defendants never asked the court to hold a live evidentiary hearing on the Commission's preliminary injunction motion.

### 3.    The district court entered a preliminary injunction and asset freeze.

On March 29, 2024, the district court granted the Commission's motion for a preliminary, asset-freezing injunction and extended the terms of the TRO pending a final adjudication of the case on the merits.  1-ORDER-2.  The preliminary injunction also enjoined the defendants from

future violations of the federal securities laws charged in the complaint and
from offering or selling Reven Holdings securities.  1-ORDER-28.  The
defendants have not challenged those portions of the injunction on appeal.

> **a.    The district court found that the Commission
> clearly established a likelihood of success on its
> fraud claims.**

The district court found that, with respect to each category of
statements discussed above, the Commission "made a clear showing that it
will likely succeed in proving that the defendants have violated the federal
securities laws and will likely do so again if they are not enjoined."  1-
ORDER-2.

*First*, the district court found that the Commission "made a clear
showing that it is likely to prove the defendants made false and misleading
statements or omissions to investors regarding the Reven Principals'
annual compensation."  1-ORDER-8.  The court found that, "even under
the defendants' calculations, the Reven Principals took in at least $4.89
million more than they disclosed for 2019-2021."  1-ORDER-14.  That
amount was material because it "constitutes over 10% of the total investor
funds that Reven raised during that period."  *Id.*  And the defendants acted

with scienter because they "knew their own salaries" and that the millions more they took "was not disclosed in the PPMs." 1-ORDER-13.

*Second*, the district court found that the Commission "made a clear showing that it is likely to prove the defendants made false and misleading statements or omissions to investors regarding the existence of audited financial statements and Reven's readiness" to become publicly traded. 1-ORDER-14—15. For example, the defendants' statement that the company "has" the minimum required two years of audited financial statements was "plainly untrue, and falsely indicated that if the public-offering path was chosen, Reven had completed all the necessary groundwork to file an S-1 statement and accomplish a listing and public offering of its shares." 1-ORDER-20. Moreover, certain statements that the defendants claimed were forward-looking also were misleading "given the known lack of a sufficient factual basis to make such statements." *Id.* (citing *Hampton v. root9B Tech., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018)). The court further found that the "misstatements regarding Reven's progress toward a public offering would be material to a reasonable investor." 1-ORDER-20. And the court found that the defendants acted with scienter, because—for example—there was "nothing ambiguous" about their flatly untrue

16

statements that Reven "has" audited financials and was "currently undergoing an audit," "and it's not reasonable to expect an investor to think that Mr. Volk didn't mean what he said." 1-ORDER-21-22.

*Third*, the district court found that the Commission "made a clear showing that it is likely to prove the defendants made false and misleading statements or omissions to investors" about the Florida lawsuit. 1-ORDER-22. The defendants had made various "too-cute-by-half rationalizations for the statements"—such as by arguing that Lange's statement denying being sued by a shareholder was literally true, because the defendants were sued by a "guardian" suing on that diminished-capacity shareholder's behalf. 1-ORDER-24. The court found that these "attempts to use overly literal (yet still incorrect or misleading) statements to hide the existence of the lawsuit shows that Mr. Lange and others attempted to hide the existence of the lawsuit from investors." *Id.*

### b. The district court found a freeze was appropriate but permitted the defendants to seek modifications to it.

The court found that a freeze was appropriate to facilitate enforcement of any remedy that might be ordered in the event of a final adjudication of liability against the defendants. 1-ORDER-28. The freeze

17

incorporates multiple modifications that the court had ordered, at the

defendants' request and without the Commission's opposition, while the

injunction motion was pending.  1-ORDER-29; 2-ORDER-12.  The

modifications permit the defendants to preserve and maintain Reven's

intellectual property and patents in various ways.  *See* 1-APPX-10—15

(Dkts. [55], [65], [68], [72], [74], [117]).

      In fashioning the scope of the freeze, the district court acknowledged

the defendants' arguments that the freeze was causing Reven's intellectual

property assets to lose value.  1-ORDER-28.  But the court reasoned that

those arguments were "closely intertwined" with the defendants' already-

rejected assertions that a preliminary injunction "should not be granted at

all" because they did not commit securities fraud.  *Id.*  The court

nevertheless explained that "the scope of the asset freeze may be narrowed

if the defendants can show that doing so will help maximize the funds

available to satisfy any potential future judgment."  1-ORDER-29.

Accordingly, the court converted the TRO into a preliminary injunction

"for now," but it invited the defendants to "promptly file a motion

addressing the scope of the preliminary equitable relief in light of this

Order, including whether a more narrow preliminary remedy or lifting of the asset freeze in whole or in part is appropriate." *Id.*

### 4. The district court declined to completely lift the freeze, but it modified the freeze.

The defendants twice asked the district court to lift the freeze in its entirety. The court refused to do so, but it granted the defendants' more tailored motion to narrow the freeze to permit the defendants to undertake specific actions to preserve the status quo.

### a. The May 17, 2024, order

On May 17, 2024, the court issued a minute order rejecting the defendants' April 12, 2024, motion to lift the asset freeze in its entirety. *See* 14-APPX-2437—48. The court reiterated that, "contrary to the defendants' repeated assertions that they have 'disproved' the alleged misappropriation, '*even under the defendants' own calculations,*' 'the Reven Principals took in $4.89 to $5.75 million more [in compensation] than they disclosed to investors' over a three-year period." 15-APPX-2562. But the court again urged the defendants to propose "a more specific plan" to narrow the asset freeze including "a description of the planned transaction(s) in which such assets would be used." 15-APPX-2562. The

19

court also stated that, if "necessary to meet any impending deadlines for patent maintenance fees or the like, the defendants may file a motion for specific limited relief from the asset freeze." *Id.*

### b.     The July 26, 2024, order

On July 26, 2024, the district court issued an order lifting the asset freeze in part. That order also resolved motions that non-party Reven investors had filed seeking to, among other things, appoint a liquidation agent. *See* 14-APPX-2476—2510, 15-APPX-2615—31; *see generally* 11 Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2904 (3d ed.) (an appeal of an injunction does not stay district court proceedings or deprive a district court of authority to modify the injunction in a way that preserves the status quo).

The district court explained that "[a]ll parties agree that the value of the defendants' intellectual property is dissipating, and that the situation requires some resolution." 2-ORDER-15. The court was presented with two, competing options "to maximize and preserve the value of the assets at issue: (A) lift the freeze in whole or in part, or (B) appoint a liquidation agent to sell the assets that are currently diminishing in value." *Id.*

20

The district court recognized that appointing a liquidation agent—as proposed by the investor group, not objected to by the Commission, and opposed by the defendants—would "immediately realize the value of the defendants' intellectual property assets and preserve that value by freezing the proceeds of the sale." *Id.* The court also observed that "it would seem wise for [the defendants] to seriously contemplate whether a sale may be in the interests of the company and its shareholders" given that, by the defendants' own admission, Reven was already in "dire financial straits" for months before the Commission filed this case and thus the defendants' preference of "obtaining alternative financing and resuming business operations and clinical trials … may not be particularly realistic." 2-ORDER-18 n.10. But the court ultimately declined to appoint a liquidation agent, agreeing with the defendants that "at this stage of the case—based only on preliminary findings and while an appeal of those findings is pending—it is not appropriate to force a sale of [Reven's] intellectual property." *Id.*

Turning to the asset freeze, the district court again found that the defendants' request that the freeze be lifted in its entirety was "not appropriate" under the circumstances. 2-ORDER-16. The court reasoned:

21

Having found that the Reven Principals made a number of
material misstatements or omissions to prospective investors
regarding Reven's operations and how millions of dollars of
investor funds would be used, [the court] cannot restore them
free reign over Reven's assets based only on a vague plan "to
avail themselves of options like taking on debt, licensing Reven's
intellectual property, and otherwise continuing to work towards
the successful deployment of [RJX]."

2-ORDER-16.

The district court found that "[a]uthorizing Reven to take on more

debt without any more specific plan or proposal would be especially

imprudent." *Id.* at 17. The court explained that, although "resuming

clinical trials is necessary to realize the value of Reven's patent portfolio,"

the parties agreed that "Reven would need to raise tens of millions of

dollars in order to resume clinical trials." *Id.* But even if the defendants

were able to obtain such funding, "it is speculative whether taking on large

debts in order to [resume clinical trials] would be in investors' best

interests" because obtaining FDA approval for RJX "will take years, if

successful, and success is uncertain." *Id.* Accordingly, "[t]aking on

millions in debt could have the effect of leaving Reven worse off and taking

its value down to zero." *Id.*

The district court nevertheless modified the freeze, in ways that the defendants had suggested, to permit the defendants "to explore alternative methods of obtaining the financing necessary to preserve Reven's assets and keep the company afloat." 2-ORDER-17—18. *First*, the court allowed third parties to pay expenses on behalf of Reven and its affiliates, excluding payment of compensation to the Reven Principals. 2-ORDER-18. *Second*, the court permitted the Reven Principals to "earn new individual income unrelated to Reven and the other defendants and use such income to pay for costs incurred by Reven." *Id. Third*, the court allowed the Reven Principals to incur new debt on an individual basis, including by using their remaining real or personal property as collateral for such debt, and to use those funds to pay for costs incurred by Reven. *Id. Fourth*, the court permitted the defendants to move to unfreeze individual bank accounts that do not contain funds attributable to the defendants. 2-ORDER-19. Each modification is subject to oversight by the court and the Commission. 2-ORDER-18—19.[2]

---

[2] The Commission explained that the defendants' proposal for third parties to pay expenses on behalf of Reven did "not appear to involve frozen assets of Defendants or implicate the asset freeze order." 15-APPX-

**[footnote continued on next page]**

23

Finally, the district court addressed the Supreme Court's decision in *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024), which the Commission presented as supplemental authority about the factors governing injunctive relief.  Citing earlier findings, the court found that, to the extent required, "those factors are satisfied in this case."  2-ORDER-21 n.12.  The court reiterated that the Commission "has made a clear showing of its likelihood of success on the merits."  *Id.*  Moreover, "absent some kind of asset freeze, dissipation of the defendants' assets could irreparably harm existing investors and the availability of funds to pay any disgorgement or other future judgment."  *Id.*  Finally, the partial lifting of the freeze "balances the harm to the defendants against the harm to the Commission and investors," and "the injunction is not adverse to the public interest."  *Id.*[3]

---

2638.  Likewise, "the asset freeze order does not restrict Defendants from earning income." 15-APPX-2639.  But the Commission argued that the defendants' requests for these modifications lacked detail and should be subject to court supervision to ensure that the defendants did not improperly encumber Reven's assets.  15-APPX-2638—39.

[3]     On August 30, 2024, Reven, Reven IP Holdco, and Reven, LLC filed a complaint against the United States for $100,000,000, alleging that the asset freeze at issue here unconstitutionally "deprived Reven of all beneficial use of its intangible and tangible property … without just compensation, in violation of the Fifth Amendment."  *See* Dkt. [1], *Reven Holdings v. United States*, 24-cv-1353 (Ct. Fed. Cl.).

## STANDARD OF REVIEW

This Court reviews for an abuse of discretion a district court's order granting or modifying a preliminary injunction, as well as its determination not to hold an evidentiary hearing. *See Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1252 (10th Cir. 2017); *Flood*, 618 F.3d at 1117; *SEC v. Young*, 2022 WL 2977080, at \*5-\*6 (10th Cir. 2022); *Robinson v. City of Edmond*, 160 F.3d 1275, 1286 (10th Cir. 1998). This Court may affirm the district court on any grounds with support in the record. *Wyandotte Nation*, 443 F.3d at 1252.

## SUMMARY OF ARGUMENT

1.      The district court acted within its discretion in ordering a preliminary, asset-freezing injunction. The court reasonably found that the Commission made a clear showing that it will likely succeed in proving that the defendants have violated the federal securities law. A temporary freeze is appropriate to preserve the status quo and prevent the defendants from further dissipating investor funds. And the court reasonably

balanced the equities and the public interest by consistently modifying the freeze when the defendants presented a concrete, reasonable proposal.

2.    The district court acted within its discretion in deciding to modify the freeze, rather than to lift it entirely.  In light of the nature and breadth of the defendants' misconduct, the court reasonably found that it could not grant the defendants complete, unsupervised control over Reven's assets based only on their "vague plan[s]."  The court modified the freeze to permit the defendants to explore other methods of preserving Reven's assets and keep the company afloat, subject to the court's supervision.  That sensible resolution reasonably reconciles the competing interests in this case.

3.    The district court acted within its discretion in deciding the injunction motion based on documentary evidence.  The Rules of Civil Procedure recognize that district courts may determine motions on briefs, without oral hearings.  It was especially reasonable for the court to rule on the documentary evidence in this case, given that the parties jointly moved to vacate the hearing that had been set and the defendants never requested a hearing thereafter.

## ARGUMENT

In multiple, comprehensive opinions, the district court thoroughly considered the law and facts in finding that a preliminary, asset-freezing injunction was necessary to preserve the status quo and protect Reven's defrauded investors from additional harm by preventing the defendants from further dissipating or encumbering what remained of Reven's minimal assets. The defendants do not identify any legal error in the court's reasoning, and they mischaracterize the facts rather than show that the court clearly erred in weighing the evidence. Their arguments are particularly misplaced given "the realities" surrounding preliminary injunctions, "where the 'district court almost always faces an abbreviated set of facts and must hypothesize the probable outcome of a case.'" *Oklahoma v. United States Dep't of Health & Hum. Servs.*, 107 F.4th 1209, 1216 (10th Cir. 2024) (quoting *Resol. Tr. Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992)).

The defendants' overwrought rhetoric about the freeze's impact on Reven and the public is misguided. Reven asserts that the freeze has "decimated the very assets it was intended to preserve" and "den[ied] the public of a breakthrough treatment for several life-threatening health

conditions." Br.53-54. But it is common ground that—having used

millions of dollars in investor funds to pay the Reven Principals in

undisclosed compensation as well as to settle a shareholder lawsuit

accusing Reven of fraud—Reven was in "dire financial straits" *before* the

Commission brought suit. Br.13. The district court nevertheless

consistently allowed the defendants to make payments for patent-related

prosecution and maintenance expenses, to the extent appellants had

sufficient funds and had made a specific proposal to do so. 2-ORDER-12.

Yet, despite the court's balanced and careful approach, the reality is that

Reven is still, at best, years and tens of millions of dollars away from

bringing its purported breakthrough treatment to the market. And the

overwhelming evidence of the defendants' fraud shows that they have only

themselves to blame insofar as "Reven has lost substantial credibility with

existing investors [and] potential future investors." Br.23.

## I.     The district court acted within its discretion in ordering a preliminary, asset-freezing injunction pending resolution of the action.

Based on its careful assessment of the record evidence, the district

court reasonably concluded that a preliminary, asset-freezing injunction in

this case is appropriate to preserve the status quo and protect the court's

28

ability to order effective equitable relief.  The defendants provide no sound

basis for disturbing those rulings.

## A.    Relevant Legal Standards

### 1.    Preliminary Injunction and Asset Freeze

Congress has authorized district courts in Commission actions to

enjoin illegal acts or practices and to enter, "upon a proper showing, a

permanent or temporary injunction or restraining order."  15 U.S.C. 77t(b),

78u(d)(1).  In addition, in any action or proceeding brought by the

Commission under any provision of the federal securities laws, the

Commission may seek, and a federal court may award, "any equitable

relief that may be appropriate or necessary for the benefit of investors." 15

U.S.C. 78u(d)(5).

An asset freeze ordered under the securities laws "in aid of the

recovery sought" and to prevent asset "dissipation or depletion" is

appropriate prejudgment "equitable relief."  *Deckert v. Indep. Shares Corp.*,

311 U.S. 282, 288–89 (1940).  A freeze is issued as a type of injunction that

"'preserve[s] the status quo pending a final determination of the rights of

the parties[]' in order to 'preserve the [court's] power to render a

meaningful decision on the merits[.]'"  *Cruce*, 972 F.2d at 1198 (citation

29

omitted) (first quoting *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980) and then quoting *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986)).  As a form of continuing, preliminary relief, a freeze is subject to appropriate adjustments while a case is ongoing.  *CFTC v. Am. Metals Exchange Corp.*, 991 F.2d 71, 79 (3d Cir. 1993) ("allow[ing] the freeze to remain in effect until the district court determines whether it can make an informed determination of the amount of unlawful proceeds retained by [the defendant], and, if it can, what that amount may approximate," and recognizing that the "district court can then decide to maintain, remove or modify the freeze").

To obtain a preliminary injunction, the Commission must make a clear showing that: (1) the Commission is likely to succeed on the merits; (2) irreparable harm will result in the absence of preliminary relief; (3) the balance of equities tips in favor of preliminary relief; and (4) the injunction is in the public interest.  *Starbucks Corp.*, 602 U.S. at 346 (citing the four-factor standard in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *see SEC v. Chappell*, 107 F.4th 114, 127 (3d Cir. 2024), (applying *Starbucks* to an asset freeze imposed in a Commission civil enforcement action).

This Court should reject the defendants' request to unduly complicate and elevate the requisite showing for freezes and injunctive relief. *See* Br.25-28. The defendants assert that, in addition to the four, traditional injunctive factors discussed in *Starbucks*, the Commission must establish two additional factors: (1) a clear showing that a violation of the securities laws has occurred; and (2) a substantial showing that the violation is likely to occur again. Br.26-27. But the defendants do not identify any "clear command from Congress" requiring those factors (*Starbucks*, 602 U.S. at 346), especially for a preliminary asset freeze as opposed to a request for a permanent injunction against future securities law violations. *Compare SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993). Moreover, properly ordered asset freezes are a recognized form of equitable relief (*see Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 324-25 (1999); *Deckert*, 311 U.S. at 288-89), and they are not "historically disfavored," as the defendants argue (Br.27).[4]

---

[4]    The district court's statement that the Commission sought "injunctive relief that mandates action or alters the status quo" (10-APPX-1455; *see also* 1-ORDER-5) is best understood to refer to the Commission's request for affirmative acts, such as expedited discovery. *See, e.g.*, 10-APPX-1460 (TRO ordering discovery); 1-ORDER-29—30 (extending the TRO in the **[footnote continued on next page]**

## 2.    Antifraud Violations

Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance" in violation of Commission rules.  15 U.S.C. 78j(b).  Exchange Act Rule 10b-5, which implements Section 10(b), makes it unlawful, "in connection with the purchase or sale of any security," directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud
>
> (b) To make any untrue statement of a material fact … , or
>
> (c) To engage in any act, practice, or course of business which
>
>  operates or would operate as a fraud or deceit upon any person.

17 C.F.R. 240.10b-5.

---

preliminary injunction); *see also SEC v. Scoville*, 913 F.3d 1204, 1214 n.5 (10th Cir. 2019) (accepting for purposes of appeal that asset-freezing injunction "did more than maintain the status quo" because "it also required [the defendant] affirmatively to provide the receiver with any information she deemed necessary").  Regardless, nothing in this case turns on whether a heightened standard applies.  *See Free the Nipple-Fort Collins v. Fort Collins*, 916 F.3d 792, 797-98 & n.3 (10th Cir. 2019) (expressing "doubts," but not deciding whether a "heightened standard applied" to injunctive relief, where the plaintiffs prevailed regardless).

Section 17(a) of the Securities Act makes it unlawful, "in the offer or sale of any securities," directly or indirectly:

> (1) to employ any device, scheme, or artifice to defraud, or

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Exchange Act Section 10(b) and 17(a)(1) require proof that the defendant acted with scienter—knowingly or recklessly. *See SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012). Proof of negligence is sufficient to establish a violation of Sections 17(a)(2) and (a)(3). *Id.* at 857.

### B. The court reasonably found that the Commission established a likelihood of success on the merits of its fraud claims.

The district court reasonably found that the evidence "clearly shows" that the Commission is likely to prove that the defendants committed securities fraud. 1-ORDER-7. The defendants repeatedly made false and

materially misleading misstatements to investors about three topics: (1) the

Reven Principals' compensation; (2) Reven's having audited financials and

its readiness to go public; and (3) the existence of a lawsuit against Reven,

Lange, and Volk for securities fraud.

### 1. The defendants made misstatements about the Reven Principals' compensation.

The district court found—and the defendants do not dispute—that,

"even under the defendants' calculations, the Reven Principals took in at

least $4.89 million more than they disclosed for 2019-2021." 1-ORDER-14.

Those misstatements about a substantial portion of the amount of money

that the defendants raised from investors were material. 1-ORDER-11—12.

And the defendants acted with scienter, because they "knew their own

salaries"—as well as the millions more in compensation that they took—

but the truth "was not disclosed" to investors. 1-ORDER-13. The

defendants' contrary arguments lack merit.

### a. The defendants misstated the Reven Principals' compensation.

The defendants' argument (Br.34) that they had "contractual rights"

to the money they received is a meritless distraction. Under the plain text

of the antifraud provisions at issue and the "full disclosure" philosophy of

the federal securities laws, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972), what matters is what the defendants told investors, not what the defendants secretly agreed to between themselves. *See SEC v. Kokesh*, 884 F.3d 979, 980, 985 (10th Cir. 2018) (ordering disgorgement where the defendant had a contractual amendment purportedly authorizing "reimbursements to cover the salaries of the Advisers' 'controlling persons,' a term that include Defendant and other officers," but the amendment "was obtained through misleading proxy statements signed by Defendant that falsely identified him as the only controlling person and grossly underreported his salary"). And as the district court reasonably found, the defendants' disclosures about the Reven Principals' compensation were undeniably false. 1-ORDER-14; 2-ORDER-10; 15-APPX-2562. The defendants do not dispute that finding.

The defendants are on no firmer ground in arguing (Br.34-35) that their true compensation was set forth in "governing employment agreements" that were "readily available to investors." These employment agreements were internal company documents that the defendants did not provide to investors and thus could not possibly "neutralize the deceptive" statements defendants publicly made. *Virginia Bankshares, Inc. v. Sandberg*,

35

501 U.S. 1083, 1097-98 (1991). The defendants' suggestion that the investors to whom they owed a fiduciary duty should have "requested to see" those agreements (Br.36), rather than taking the defendants' representations at face value, flies in the face of the securities laws' full-disclosure regime. *See Geman v. SEC*, 334 F.3d 1183, 1189 (10th Cir. 2003). Regardless, whether the defendants' statements altered the total mix of information publicly available to investors was relevant at most to whether those statements were "material," not to whether they were false. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (cited Br.35); *see also SEC v. Lemelson*, 57 F.4th 17, 27 & n.9 (1st Cir. 2023) (a factfinder may conclude that a defendant whose statements "flatly contradict" the "publicly available facts" has made a material misstatement).

The Commission's emphasis on disclosure does not represent a shift in theory, as the defendants erroneously argue. *E.g.*, Br.32-33. The Commission has consistently litigated this as a disclosure case. *See, e.g.*, 1-APPX-30—33 (complaint); 1-APPX-78—81 (TRO brief). Moreover, as the district court repeatedly found, falsely understating the amount of investor funds the defendants took *is* misappropriation. *See* 1-ORDER-9; 15-APPX-2562; *see also* MISAPPROPRIATION, Black's Law Dictionary (12th ed. 2024)

("The application of another's property or money dishonestly to one's own use.").  Such lies are a classic form of securities fraud.  *See, e.g.*, *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972) ("[M]isappropriation is a 'garden variety' type of fraud.") (quoting *Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971))).

And a focus on "accuracy and completeness" does not make this case "watered-down" or "pedestrian." Br.32-33.  Ensuring that disclosures to investors be accurate and complete is crucial to the congressional goals of promoting honest securities markets, investor confidence, and the full-disclosure regime on which the securities laws are based.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015); *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *United States v. O'Hagan*, 521 U.S. 642, 658 (1997); *United States v. Naftalin*, 441 U.S. 768, 777 (1979); 15 U.S.C. 78b.

> **b.    The defendants' compensation-related misstatements and omissions were material.**

The district court's finding that the Commission made a clear showing that the defendants' lies about their compensation were material

37

(1-ORDER-11—12, 14) is consistent with the case law and the facts of this case. "What reasonable investor would not wish to know that the money raised by stock sales would not be used for working capital but be diverted to [the issuer's] officers?" *SEC v. Rsch. Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978); *see also* 1-ORDER-11—12 (collecting cases). Materiality is particularly evident in this case because, "even under the defendants' calculations, the Reven Principals took in at least $4.89 million more than they disclosed for 2019-2021," which "constitutes over 10% of the total investor funds that Reven raised during that period." 1-ORDER-14.

In arguing to the contrary, the defendants again misconstrue *Grossman*. *See* Br.35-36. *Grossman* explained that materiality must be analyzed "in context" and underscored that the "statements complained of … were made in conjunction with a registration statement that contained many explicit risk factors and warnings which [the plaintiff] ha[d] not challenged as inadequate." 120 F.3d at 1120-21. In contrast, as noted above, the employment contracts that the defendants claim accurately represent the Reven Principals' compensation were internal, non-public documents, which the defendants did not provide to investors.

The defendants appear to have abandoned their argument that "their statements regarding executive compensation were not material because they 'came with disclaimers about forward-looking expectations and management's discretion regarding the use of funds.'"  1-ORDER-12. Regardless, as the district court observed and the defendants do not dispute, "at least some (or all, if there were typographical errors as the defendants state) of the disclosed compensation in the 2020 and 2021 PPMs was presented as actual compensation for past years, not 'forward-looking' estimated compensation."  *Id.*  And the defendants' generic statement that investors could "obtain additional information and/or documents in connection with making an investment decision" (*see, e.g.*, 9-APPX-1133; 2-APPX-362) does not come close to the sort of substantive," "tailored" (*SEC v. GenAudio*, 32 F.4th 902, 928-29 (10th Cir. 2022)), or "specific" cautionary language that may "nullify any potentially misleading effect" of a false statement (*Grossman*, 120 F.3d at 1120).

The defendants' remaining arguments misstate the record and the district court's analysis.  The defendants contend that "no known investor ever expressed an interest in the compensation of the Reven Principals" (Br.37), but the Commission did present such evidence.  1-ORDER-11, n.8.

Nor did the court "disregard[]" the defendants' evidence or conclude that "any and all disclosures that in any way touch on 'executive compensation' are material as a matter of law."  Br.37.  Rather, the court correctly held that materiality turns on "whether a *reasonable* investor would find the [allegedly misleading] statements material" and that whether "particular investors relied on" the statements "is not dispositive."  1-ORDER-11; *see GenAudio*, 32 F.4th at 921, 952-53 (materiality turns on whether a "reasonable investor would consider it important in determining whether to buy or sell stock," and the "extra-textual" element of reliance is not required in a Commission enforcement action).

> **c.    The defendants made their compensation-related misrepresentations with scienter and, at a minimum, negligently.**

As in the district court, the defendants do not "even attempt to argue that they were not negligent" under Securities Act Sections 17(a)(2) and (3) in making the misrepresentations about their own compensation.  1-ORDER-14.  And with respect to the court's scienter analysis, the defendants make a series of irrelevant assertions that do not undermine the court's findings.

The defendants assert that they were "entitled to" or "believed they were entitled to" the compensation "under their employment agreements." Br.49.  But as the district court found, the defendants "knew they received compensation other than their salaries during the relevant time period, and that that other compensation was not disclosed in the PPMs."  1-ORDER-13.  Moreover, the "PPMs expressly state that they 'set[] forth the annual and long-term compensation paid to our Chief Executive Officer and the other  executive officers,' *i.e.*, 'the amounts of compensation actually being paid."  1-ORDER-13—14.  This uncontradicted evidence shows that, at a minimum, the "Reven Principals must have known" that their "disclosures had the potential to be misleading."  1-ORDER-14.

The defendants' attempts to rationalize their statements are meritless. Whether the defendants "put their own funds *into* the Company" (Br.49; *see also* Br.50) (emphasis added) does not speak to whether they lied to investors about the funds they took *out* of the company.  The defendants' assertion that they have "foregone compensation" since the asset freeze (Br.49) does not—and could not—bear on whether the defendants knew or must have known that they were not accurately describing their compensation to investors *before* the freeze.  Moreover, the defendants

should not receive credit for complying with the court's orders, especially

where, as here, Reven was already in such "dire financial straits" that most

of the money already was gone at the time of the freeze.  2-ORDER-18,

n.10.

### 2. The district court reasonably found that the defendants misled investors about Reven's readiness to go public.

Access to the public markets can help companies raise capital,

increase liquidity for their stock, attract and compensate employees, and

create publicity, brand awareness, or prestige.[5]  As the defendants were

aware, one of the prerequisites for a public listing is obtaining audited

financial statements.  1-ORDER-18—19.  Audited financials are important

because "[i]nvestor confidence is bolstered by the knowledge that public

financial statements have been subjected to the rigors of independent and

objective investigation and analysis" by auditors.  *McCurdy v. SEC*, 396

F.3d 1258, 1261 (D.C. Cir. 2005); *see also United States v. Arthur Young & Co.*,

465 U.S. 805, 819 n.15 (1984) ("The SEC requires the filing of audited

financial statements in order to obviate the fear of loss from reliance on

---

[5]      "Should My Company Go Public?", *available at*:
https://www.sec.gov/resources-small-businesses/going-public/should-my-company-go-public.

inaccurate information."); *New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo*, 122 F.4th 28, 53 (2d Cir. 2023), as amended (Oct. 31, 2024) (discussing importance of audit certifications).

The undisputed facts show that Reven: never hired an audit firm, much less *started* an audit, and thus never had (or imminently could have had) audited financial statements; never completed prerequisites to have an audit; never met various other exchange-imposed requirements to go public; and, therefore, was nowhere near close to going public.  *Supra* at 8-10.  Yet the defendants made the "plainly untrue" statement that Reven "has" audited financials, falsely stated that Reven was "currently undergoing" an audit that "should be completed" within months, and otherwise misled investors about Reven's readiness to go public.  *See supra* at 8-10.  The defendants' assertion that the district court "disregarded" their evidence in a "single cursory paragraph" (Br.42) ignores the court's thorough, careful discussion (*see* 1-ORDER-14—22).

> **a.**    **The defendants' statements were false and misleading.**

The defendants assert that, when they stated in no uncertain terms in November and December 2021 that the company "has" the necessary two

years of audited financial statements, their "intent" was to show the

necessary requirements "***will be met***."  Br.40-41 (emphasis in original).  But

as the district court explained in rejecting the defendants' similar attempt

to rationalize Volk's false assertion that Reven "was currently undergoing"

its first audit, there is "nothing ambiguous about this sort of

statement, and it's not reasonable to expect an investor to think that Mr.

Volk didn't mean what he said."  1-ORDER-22.  The same is true of the

defendants' statement that "Reven 'has' the audited financial statements."

*Id.*  "Changing 'will have' to 'has,' if not an intentional falsehood, was

certainly misleading."  1-ORDER-20.  These findings also dispose of the

defendants' assertion (Br.50) that they did not act with scienter.

The defendants' attempt to explain away these "plainly untrue" (1-

ORDER-20) statements does not engage with the evidence.  They contend

that one of the witnesses "'believed that financial statements were in the

process of being prepared and finalized,' ***not*** that they already existed."

Br.41.  But the witness was not speaking about the defendants'

demonstrably false statements *in late 2021* that Reven "has" audited

financials.  *See* 14-APPX-2296 (witness testifying that, *at some point between

May 2019-August 2019*, Volk "assured her that [Reven's financial

44

statements] were in the process of being prepared and would be provided").

The defendants argue further (Br.41) that Lange's February 2020 statement to an investor that Reven already *had* filed a Form S-1 was not a material misstatement because, later in the year, the investor received two more communications informing her that Reven *had not* filed a Form S-1. But as the defendants concede (Br.46), the falsity of a statement and its materiality are determined "in light of the circumstances existing at the time the alleged misstatement occurred." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000); *see, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018) (for statement to be false or misleading it must "directly contradict what the defendant knew at the time" or "omit[] material information").

The district court also reasonably rejected the defendants' assertion that the defendants' statements about Reven's readiness to go public were forward-looking and that a public offering was not guaranteed. *See* Br.40. As the court explained, "[a]ttempting to cast all statements as mere forward-looking opinions in this context is insufficient given the known lack of a sufficient factual basis to make such statements."  1-ORDER-20; *see*

*GenAudio*, 32 F.4th 930-31 ("[A] few stray sentences … pointing to the fact that no deal with Apple was guaranteed … hardly would negate—as a logical and commercially practical matter—the misleading import of the cover letter's statement that a deal with Apple was *imminent*.").  For example, "Lange's statement that an audit would be completed in the next 45-60 days" was misleading, given that the defendants knew they had not even started an audit.  1-ORDER-20; *see GenAudio*, 32 F.4th at 931 ("Irrespective of how Panglossian or rosy [the defendants'] subjective view was … he did not have license under the securities laws to make material representations to investors that had no foothold in reality.").

### b.    The defendants' statements were material.

As noted above, the existence of audited financial statements—which are a prerequisite to a private company's ability to access the public markets—is recognized to be crucial to investors.  *Supra* at 42-43.  And in this case, the Commission provided declarations from investors stating that the defendants' representations that a public offering was imminent were important to their decision to invest.  1-ORDER-21.  Although defendants provided declarations from investors stating that they understood that a public offering "was not guaranteed," even one of those investors stated

that "[a]n important part of my decision to invest was the potential exit

strategy in the form of a Direct Public Offering."  *Id.*; *see* 13-APPX-1978—79.

The defendants incorrectly assert (Br.42) that their misstatements

were immaterial because certain investors "did not rely on" them.  But as

this Court and others have recognized, "'[t]he SEC is not required to prove

reliance or injury in enforcement actions.'"  *GenAudio*, 32 F.4th at 953

(quoting *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008)); *Accord SEC v.*

*Navellier*, 108 F.4th 19, 37 (1st Cir. 2024) ("The standard for materiality is …

not actual reliance and 'the SEC is not required to prove that any investor

actually relied on Appellants' misrepresentations.'" (quoting *SEC v. World*

*Tree Fin., LLC*, 43 F.4th 448, 465 (5th Cir. 2022))).  It is sufficient that, as

many investors' statements help show,[6] defendants' misrepresentations

were material to investment decisions.

---

[6]      *See, e.g.,* 13-APPX-1974 (investor Bill Luther stating that he "inquired
about the status of a [DPO] and associated auditing of financial statements
with [the Reven Principals]" before investing); 14-APPX-2308 (investor
Leah Schaatt stating that "if I had known that they were not doing all of the
things that they told me that they were doing to prepare for a DPO, I
would not have made the investment"), 14-APPX-2329 (investor Lee-Ann
Frost stating that she did not invest further in Reven since September 2021
because "[t]hey were not coming out with the DPO.  I didn't lose faith in
[RJX]").

### 3. The district court reasonably found that the defendants lied about being sued for securities fraud.

As discussed (at 10-11), an elderly shareholder with Alzheimer's Disease sued Reven Pharmaceuticals and Lange (and later Reven, Reven LLC, and Volk) in Florida state court for fraudulently inducing him to invest over $2.8 million in Reven. That lawsuit was pending from 2016 until September 2021, when the defendants used investor funds to settle the case for $2.75 million. The district court reasonably found that the defendants made fraudulent misrepresentations about the Florida litigation, and their use of "overly literal (yet still incorrect or misleading) statements to hide the existence of the lawsuit shows that Mr. Lange and others attempted to hide the existence of the lawsuit from investors." 1-ORDER-25.

As one example, Lange stated that, "'we have no lawsuits from shareholders' as of February 13, 2020," while the Florida litigation was pending. 1-ORDER-24. The defendants argue that Lange did not understand "that a suit brought by a guardian acting on behalf of a shareholder could be considered a 'lawsuit from [a] shareholder[].'" Br.45. But the district court's rejection of that post-hoc rationalization does not

rest on any "procedural nicety with respect to guardianship standing." Br.46. To the contrary, the court reasoned that, regardless of whether Lange's view of the plaintiff's role in the Florida litigation was "correct," Lange's hair-splitting was "only further evidence that he was trying to hide the fact of this lawsuit from potential investors with deceiving statements." 1-ORDER-24.

The district court likewise reasonably rejected the defendants' "hyperliteral" argument that their 2018 PPM was accurate because, although by that point the Florida suit had already named Reven *Pharmaceuticals*, the PPM was issued by Reven *Holdings* and Reven, *LLC*. 1-ORDER-24. That distinction does not work because Reven *Holdings* "had assumed the liabilities" of Reven *Pharmaceuticals* "as of the time of the PPM issuance." *Id.* The defendants argue (Br.45) that there is no evidence that the Reven Principals knew that. But it strains credulity that the Reven Principals—Reven's co-founders, sole acting directors, and most senior officers—would not know that Reven had undertaken such action or understand its basic legal consequences.

The district court likewise reasonably rejected the defendants' argument that the July 2020 PPM was not misleading because it "had a

disclaimer stating that there was no pending litigation that, in management's opinion, was material to the companies' financial condition."  1-ORDER-24.  The defendants contend (Br.46-47) that this disclosure was true because the Reven Principals "genuinely believed" that the Florida lawsuit "was baseless."  The court reasonably found otherwise, given that the suit had "gone on for years at this point" and settled "shortly thereafter" for an amount "totaling nearly a third of the money Reven had raised in 2020."  1-ORDER-24; *see also* 1-ORDER-25—26 ("[The suggestion that management did not think the case was 'material' to the companies' financial condition is dubious given the ultimate settlement amount relative to [Reven's] size.").  The court thus found that the defendants' statements were false when made, not in hindsight.  *Contra* Br.47.

## C.    The court acted within its discretion in evaluating the remaining preliminary injunction factors.

### 1.    Irreparable Harm

Irreparable harm can be demonstrated if there is "good cause to believe that, unless funds and assets are frozen" the defendant "will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to" a remedies order and final monetary judgment.

*Chappell*, 107 F.4th at 138; *SEC v. Liu*, 851 F. App'x 665, 667-68 & n.1 (9th

Cir. 2021) (affirming asset freeze under four-factor test, noting that

defendants would expatriate their assets absent a freeze).  The district court

found that, in the absence of a freeze, the defendants would further

dissipate what remained of Reven's assets, which would irreparably harm

existing investors and the availability of funds to satisfy a judgment.  2-

ORDER-21 n.12.  The freeze also protects investors by ensuring that Reven

does not unduly encumber Reven's assets, "leaving Reven worse off and

taking its value down to zero."  2-ORDER-17.

The defendants' only response is to seek to shift blame to the freeze,

rather than to their own conduct, for Reven's condition.  *See, e.g.*, Br.51-53.

But, as discussed, those arguments lack merit.  *See supra* 27-28; *infra* 53-54,

60-61.

### 2.    Balance of Hardships and the Public Interest

Throughout this proceeding, the district court reasonably balanced

the benefit to investors from reasonably restricting defendants' from

having unfettered control over Reven's remaining assets against the

purported harm to the defendants from having those assets frozen.  *See,*

*e.g.*, 2-ORDER-13, n.12; 1-ORDER-28—29.  As noted, the court found that a

freeze was appropriate to restrain the defendants from further dissipating assets. Nevertheless, the court granted the defendants an "allowance for necessary and reasonable living expenses," 10-APPX-1465, as well as numerous carve-outs to maintain Reven's assets, including its intellectual property and patents. *Supra* at 14. The court's subsequent partial lifting of the freeze further demonstrates that the court was sensitive to the defendants' concerns about Reven's business. *See* 2-ORDER-17—19. As the defendants themselves admitted, the adopted conditions "will help, at least incrementally, to stem the decimation of Reven shareholder value resulting from the asset freeze, while preserving funds available to satisfy any potential judgment…." 15-APPX-2592.

The district court also reasonably considered the public interest. Where, as here, the Commission "'demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the [Commission].'" *Chappell*, 107 F.4th at 139 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). Congress has tasked the Commission with protecting investors and the integrity of the securities markets. *See Lorenzo v. SEC*, 587 U.S. 71, 81-82, 85 (2018); 15 U.S.C. 78b. "Facilitating the proper

52

enforcement of" the securities laws "is all to the good." *Chappell*, 107 F.4th at 139.

The defendants complain that "by the time the district court entered the orders at issue on this appeal, the asset freeze had been in place for over a year." Br.51; *see also* Br.3 (criticizing the court's "delay"). But the defendants consented to the extension of the TRO until the Commission's injunction motion was resolved and sought multiple extensions of time to respond to that motion. *Supra* at 14. The length of time from briefing to decision reflects the court's careful review of the voluminous briefing and evidence that the parties submitted for resolution. *See, e.g.*, 1-ORDER-7. The defendants' assertion that the court "simply rubber-stamped the SEC's injunction motion" (Br.53) disregards the court's thorough reasoning and findings.

The defendants next assert that the freeze is "a disservice to the public interest" because it has hindered RJX's development, "denying the public" of a potential breakthrough treatment. Br.53. But the court has consistently considered and granted carveouts from the freeze to allow the defendants to use their few remaining assets to develop RJX. 2-ORDER-12. The defendants ignore that, given Reven's admitted "dire" financial

condition at the time the Commission filed its complaint, "resuming

business operations and clinical trials, though understandably the

defendants' preferences, may not be particularly realistic." 2-ORDER-18,

n.10. The freeze is not to blame for Reven not having sufficient funds to

maintain its intellectual property in the first place. Moreover, regardless of

how noble the defendants believe RJX to be, it was appropriate for the

court to take protective measures to ensure that the defendants' work on

that product be consistent with the securities laws.

The defendants erroneously suggest that the group of Reven

investors (whom the defendants derisively label "informants" and

"insurgent[s]") thought that the freeze is "misguided" or that it should be

lifted. Br.2-3, 22-23; 51-52. To the contrary, the investors argued that:

> Defendants' proposed solution [of completely lifting the freeze
> to permit the defendants to reassert unsupervised, complete
> control over Reven's assets] is *patently unacceptable. The Asset
> Freeze and preliminary injunction are justified remedies*; they were
> put in place precisely because the Reven Defendants were
> demonstrably poor stewards of their investor's money, having
> actively spent it to enrich themselves at the expense of their
> investors. The Court should not allow the fox to guard the hen
> house.
>
> …

> [W]ere the Reven Defendants to have their way, they would be placed back in charge of the company that this Court has already determined they likely have been stealing from, risking further harm to the investors this Court has already determined the Reven Defendants have likely defrauded.

14-APPX-2485—88 (emphasis added). These investors wanted a responsible third-party to steward Reven's remaining assets, *not* to give the defendants unchecked control over Reven by completely lifting the freeze.[7]

Finally, the defendants' assertion that the district court addressed public interest and the balance of the hardships "only in cursory fashion in a footnote" (Br.51) is misguided. The footnote that the defendants cite (2-ORDER-21, n.12) addressed the Supreme Court's decision in *Starbucks*. It was the Commission that brought *Starbucks* to the court's attention, even though the defendants had "not raise[d]" any argument about that decision. 15-APPX-2675, n.12. The defendants should not be heard to fault

---

[7] The Commission did not "abdicate[]" its role by not opposing the investors' motion for a limited intervention. Br.22, n.4. In fact, the Commission *did* oppose the investors' initial proposal for a receiver as being "overly broad and unnecessary to accomplish its ends." 15-APPX-2568. And the Commission rightly explained that the proposed intervenors' supposed motives were irrelevant because "the interest of all parties should be aligned to prevent dissipation of, and realize the highest value for, the Reven intellectual property." 15-APPX-2634.

the district court for failing to give insufficient attention to an issue that
they never raised.  And, as is apparent from the court's analysis, the
discussion referenced extensive findings that the court had already made
elsewhere.

>    **3.    The district court was not required to find a likelihood
>    of future violations, but in any event, that finding is
>    amply supported in the record.**

In addition to imposing an asset freeze, the district court ordered
other forms of injunctive relief to protect investors.  More specifically, the
court preliminarily enjoined the defendants from future violations of the
provisions charged in the complaint.  *See* 1-ORDER-28.  The court also
prohibited the defendants from offering or selling Reven Holdings
securities to "protect existing investors and potential new investors from
being subject to additional fraudulent activities while the litigation is
pending."  *Id.*  In imposing that relief, the court found that "the defendants
will likely continue their statutory violations in the future if they are not
enjoined."  1-ORDER-26; *see generally Pros Int'l, Inc.*, 994 F.2d at 769; *SEC v.
Curshen*, 372 F. App'x 872, 882-83 (10th Cir. 2010).

A finding of a likelihood of future violations is not, however, a
prerequisite for an asset-freezing injunction.  *See* Br.26; 47-50.  Whether a

defendant poses a risk of future violations may inform the issuance and scope of a freeze because—for example—it may suggest that the defendant is willing to conceal assets subject to disgorgement. *See, e.g.*, *Chappell*, 107 F.3d at 138 ("Chappell's apparent (on this record) willingness to trade on inside information to avoid losses makes us wary that he would also, but for the preliminary injunction, seek to conceal assets to avoid a potential future order directing him to disgorge an amount equal to the losses he avoided."). But as a case on which the defendants rely explains, "when the relief sought is an asset freeze, the SEC does not need to show a likelihood that the violation will occur again because this injunctive relief maintains the status quo." *SEC v. Cell>Point, LLC*, 2022 WL 444397, at *5 (D. Col. Feb. 14, 2022) (cited Br.26, 48).

Regardless, the district court reasonably found that the "evidence clearly shows that the defendants will likely continue their statutory violations in the future if they are not enjoined." 1-ORDER-26; 2-ORDER-21 n.12. The defendants' contrary arguments (Br.47-50) repeat their erroneous challenges to the court's liability findings and fail for the reasons discussed herein.

## II. The district court acted within its discretion in partially lifting the asset freeze under the more specific conditions proposed by the defendants.

The defendants cannot show any abuse of discretion in the district court's ruling on their motion to lift the freeze. Given the evidence of the defendants' fraud, the court reasonably found that it could not grant the defendants complete, unsupervised control over Reven's assets based only on their "vague" plans to take on debt, license Reven's intellectual property, and continue to work toward the successful deployment of RJX. 2-ORDER-16; *see also* 2-ORDER-21, n.12 ("[A]bsent some kind of asset freeze, dissipation of the defendants' assets could irreparably harm existing investors and the availability of funds to pay disgorgement or other future judgment."). Nevertheless, the court modified the freeze to permit the defendants "to explore alternative methods of obtaining the financing necessary to preserve Reven's assets and keep the company afloat." 2-ORDER-17—18. The defendants contend that even that measured approach was an abuse of discretion. They are mistaken.

**A.    The district court acted within its discretion in declining to dissolve the freeze.**

The defendants first contend that the court was required to lift the freeze in light of "uncontradicted evidence" that there "had been no 'misappropriation' as the SEC originally asserted."  Br.54; *see also* Br.61 ("There is no colorable, let alone overwhelming, evidence of fraud here."). That erroneous challenge to the court's preliminary fraud findings fails for the reasons stated above.  Moreover, a freeze was independently warranted because, as previously discussed (at 8-11), the defendants made multiple other false and materially misleading statements to investors.

The defendants also miss the mark when they argue that the district court improperly relied on cases that involved "pyramid scheme[s]," "fictional accounts," or "made-up results."  Br.61; *see* Br.58-61.  Such facts may inform the issuance and scope of a preliminary, asset-freezing injunction.  But none of the district court cases that the defendants cite holds that such findings are necessary for a freeze.  The freeze here is justified by the court's findings discussed above, including that injunctive relief was necessary to preserve the status quo and protect Reven's assets from further dissipation.  Whether the court appropriately exercised its

59

discretion in making that fact-dependent determination does not turn on whether this case is on all fours factually with other decisions.

In any event, the defendants appear to agree with a decision (also cited by the district court) that maintaining a freeze is appropriate where the underlying business was "'not lucrative enough to warrant the risk of further depleting' the minimal assets it possessed." Br.60 (quoting *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 3d 1441, 144-45 (D.D.C. 1992) (also cited 2-ORDER-17). That is this case. As the court explained, "[a]uthorizing Reven to take on more debt without any more specific plan or proposal would be especially imprudent." 2-ORDER-17. Reven needs "tens of millions of dollars in order to resume clinical trials." *Id.* But "[o]btaining FDA approval for RJX will take years, if successful, and success is uncertain." 2-ORDER-17. Accordingly, "[t]aking on millions in debt could have the effect of leaving Reven worse off and taking its value down to zero." *Id.*

The defendants' arguments that the freeze should never have issued and that the court's injunctive relief is to blame for the condition that Reven now finds itself in are meritless for the reasons above. To reiterate, even before the district court imposed a freeze, Reven had been in "dire financial

60

straits" for months.  2-ORDER-18 n.10.  The only other conceivable ways

for Reven to generate sufficient capital to preserve its assets would be to:

offer and sell securities to new investors (which, as previously discussed,

the injunction reasonably prevents, and the defendants do not challenge);

liquidate what little remains of Reven's assets (which the defendants

opposed); or seek funding under the terms of the modified asset freeze

(which the defendants proposed but now criticize, as discussed below).

### B.    The district court acted within its discretion in modifying the freeze.

The defendants' argument (Br.56) that the modifications to the asset

freeze are a "band-aid on a bullet wound" ignores that *the defendants* are

the ones who proposed those conditions to the court.  *See* 2-ORDER-17—18.

The defendants object that "to preserve assets, action needed to be taken

quickly in the face of rapidly approaching deadlines, and to require

conferral with the SEC and approval by the court, wastes precious time."

Br.56.  But judicial oversight is the very point of a freeze.  Moreover, the

defendants received multiple carve-outs from the asset freeze under that

approach, and the court has acted expeditiously.  *See supra* at 14.

The defendants next contend that the modifications they proposed are insufficient because, supposedly due to the Commission's "failure to properly identify and place *lis pendens* on the Reven Principals' property, they have already lost valuable property"—Volk's lake house in Minnesota.  Br.56.  The defendants do not explain the connection between those events.  Regardless, if that were a problem with the modifications, the defendants should not have proposed them, and they cannot blame the court for adopting their suggestion.  Moreover, the pages of the record that the defendants cite explain that the court's oversight of the freeze reasonably protects their interests.  The Commission "did not object" to Volk's request to modify the freeze to permit a transaction that would "potentially redeem" that house, and the district court "approved this transaction the same day Defendants filed the motion for relief."  14-APPX-2452.

Finally, the defendants' argument (Br.57) that the court's modifications to the freeze were "too little and too late" fails.  For nearly a year, the defendants unreasonably maintained that only a complete elimination of the freeze would preserve Reven's assets and refused to propose a more specific plan to narrow the freeze.  The court gave the

62

defendants every opportunity to come forth with a specific plan to preserve Reven's assets, and it granted their specific requests when the defendants (eventually) made such a proposal.

## III.   The court acted within its discretion in issuing the preliminary injunction without a hearing.

The defendants argue that the district court was required to hold an evidentiary hearing to rule on the Commission's preliminary injunction motion.  Br.37, 42-43 & n.7, 46, 50-51, n.8, 62-64.  But they cannot show any abuse of discretion in the court's decision to decide the Commission's motion on the basis of documentary evidence, as the parties jointly requested.

The district court's ruling was consistent with the rules of civil procedure.  Federal Rule of Civil Procedure 78(b) permits courts to "determin[e] motions on briefs, without oral hearings."  Fed. R. Civ. P. 78(b); *see SEC v. Hallam*, 42 F.4th 316, 324 (5th Cir. 2022) ("Deciding" a motion "on the record and briefs was consistent with the rules of civil procedure."); D.C.COLO.LCivR 7.1(h) ("A motion may be decided without oral argument at the discretion of the court."); *see also Reynolds and Reynolds Co. v. Eaves*, 149 F.3d 1191, at *3 (10th Cir. June 10, 1998) (table decision)

63

("Reynolds has failed to cite any Tenth Circuit authority that requires a district court to hold an evidentiary hearing prior to granting or denying a preliminary injunction motion."); *Pittman v. Long*, 2024 WL 128169, at *3 n.4 (D. Colo. Jan. 11, 2024) (collecting cases).  And, as a case that the defendants cite explains, Federal Rule of Civil Procedure 65 "does not explicitly require the court to conduct an evidentiary hearing before issuing an injunction."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007).

The defendants' arguments are particularly misplaced on this record. The defendants assert (Br.63) that the court "originally agreed to hold a hearing," "subsequently reversed course … and *sua sponte*" stated that it would reset the hearing, and later "did not permit a hearing."  In reality, the court vacated the hearing because the parties *jointly* asked it to do so. *Supra* at 13-14.  Indeed, it is clear from the parties' joint motion that vacating the hearing was the defendants' idea.  *See* SA-29 (stating that the defendants recently had retained counsel and that they "need[ed] additional time to learn the facts of the case," and the Commission responding that it "has no objection to vacating the preliminary injunction hearing").  The court did not abuse its discretion by giving the defendants

what they wanted.  *See* 11A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2949 (3d ed.) ("[T]he parties may submit their dispute to the court on written evidence if they choose, but if they do, the losing litigant cannot complain subsequently about a procedure to which he consented.").

The parties' stipulation was "without prejudice to any further requests by the Commission, the Defendants, and the Relief Defendants to reset such hearing on a future date."  SA-29.  But the defendants never made any such request in any of the multiple filings they made while the motion was pending, such as the numerous extensions or carve-outs from the asset freeze that they obtained.  This Court "will not vacate and remand for a hearing the parties did not request."  *Young*, 2022 WL 2977080, at *5; *see also Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 538, 545 (10th Cir. 2000) ("'Ordinarily, a district court does not abuse its discretion in deciding not to hold an evidentiary hearing when no such request is ever made.'" (quoting *Robinson*, 160 F.3d at 1286); *Prosper, Inc. v. Innovative Software Technologies*, 188 F. App'x 703, 706 (10th Cir. 2006) ("[G]iven the absence of a request for a hearing and some conjecture on what that hearing would

have demonstrated…, we cannot conclude that the district court abused its discretion.").[8]

The authorities that the defendants cite do not require a contrary result. None of those cases holds that an evidentiary hearing is required whenever a preliminary injunction is sought, much less where the parties jointly moved to vacate the hearing and never again requested one. *See, e.g.*, *Certified Restoration*, 511 F.3d 535. Moreover, those cases recognize that an injunction may issue without a hearing where, as here, "the district court 'had before it adequate documentary evidence upon which to base an informed, albeit preliminary, conclusion' that the plaintiff would prevail on the merits." *Id.* at 553 (quoting *SEC v. G. Weeks Sec., Inc.*, 678 F.2d 649, 651 (6th Cir. 1982)). Moreover, as discussed, many of the critical facts in this case are undisputed and this is not a situation where "credibility determinations must be made to decide whether injunctive relief should issue." *Certified Restoration*, 511 F.3d at 553.

---

[8] Without citing any evidence, the defendants assert that they "inquired with the court about a possible hearing" while the injunction motion was pending. Br.63. No such inquiry is in the record. *See* Fed. R. App. P. 10.

## CONCLUSION

This Court should affirm the district court's March 29, 2024, and July

26, 2024, orders.


Respectfully submitted,

DANIEL STAROSELSKY
Assistant General Counsel

 /s/ Paul G. Álvarez
PAUL G. ÁLVAREZ
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov


December 2024

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because, according to the word processing program with which it was prepared (Microsoft Word for Microsoft 365), this brief contains 12,901 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because the brief uses a 14-point proportionally spaced typeface.

Dated:  December 20, 2024          _/s/ Paul G. Álvarez_____
                                   PAUL G. ÁLVAREZ
                                   Senior Appellate Counsel

                                   Securities and Exchange
                                   Commission
                                   100 F Street, N.E.
                                   Washington, D.C.  20549
                                   (202) 551-5038 (Álvarez)
                                   alvarezp@sec.gov

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R.

25.5;

(2) if required to file additional hard copies, that the ECF

submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with a

commercial virus scanning program, Trellix Endpoint Security,

and according to the program are free of viruses.

 /s/ Paul G. Álvarez

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that today, December 20, 2024, a copy of the foregoing brief was electronically filed with the Court's CM/ECF system, thereby effecting service on appellants.

 <u>/s/ Paul G. Álvarez</u>
PAUL G. ÁLVAREZ
Senior Appellate Counsel

Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov